IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THOMAS MANDEVILLE,

       Plaintiff,

  v.

CLINITY TALENT, LLC and ROBERT PALERMO,

       Defendants.

OPINION and ORDER

25-cv-104-jdp

---

Plaintiff Thomas Mandeville was vice president of defendant Clinity Talent, LLC, a recruitment firm specializing in the health care sector, until Clinity's chief executive officer, defendant Robert Palermo, fired him. Mandeville alleges that defendants haven't paid him the commissions that he earned before he was fired, and that Palermo made false and disparaging comments about him after he was fired. Mandeville brings state-law contract and tort claims against defendants and contends that they violated state wage law. Defendants bring state-law contract and tort counterclaims against Mandeville. Both sides move for summary judgment.

This opinion resolves all Mandeville's claims and all defendants' counterclaims. As will be explained, the court will grant summary judgment to Mandeville on his breach of contract and state wage claims. The court will also grant summary judgment to Mandeville on defendants' breach of contract, tortious interference with contract, and breach of fiduciary duty counterclaims. The court will grant summary judgment in defendants' favor on Mandeville's breach of the implied covenant of good faith and fair dealing, bad faith termination, defamation, invasion of privacy, and tortious interference with contract claims. The bottom line is that all claims and counterclaims are resolved, and Mandeville will be awarded $169,227, which is two times the amount of the commissions owed to Mandeville.

BACKGROUND

The court draws the following facts from the parties' proposed findings of fact. These facts are undisputed except where noted.

In December 2023, defendants promoted Mandeville to vice president of Clinity. Mandeville's offer letter indicates that he would be eligible to receive commissions for recruiting health care organizations to Clinity and placing health care providers with Clinity's clients. For each organization or provider whom Mandeville recruited or placed, he would receive a certain percentage of the fee that Clinity charged to its client; the exact percentage would depend on whether he recruited and managed the organization or provider himself or with the assistance of coworkers. Clinity would pay Mandeville's commission "if and when Clinity Talent's client [paid] Clinity Talent's applicable invoice related to that payment." Dkt. 26, Ex. 1, at 2.[1] Mandeville accepted defendants' offer.

Mandeville participated in three placements relevant to this litigation: the placement of A.C., and the recruitment and placement of C.H. and K.R.[2] The parties dispute whether Mandeville was *entitled* to commissions for these placements, but it is undisputed that the commissions would total $84,613.50. Defendants have not paid Mandeville the commissions.

In summer and fall 2024, Mandeville participated in an attempted placement that ultimately failed. Clinity sought to place a candidate, N.M., with a potential client, Amoskeag Health. Clinity's recruitment fee was a sticking point in the negotiations. Amoskeag Health indicated that it wouldn't budge on an 18 percent recruitment fee; that was the maximum

---

[1] Citations to filings from the docket use the page numbers assigned by the court's electronic filing system, not the page numbers in the original document.

[2] The parties use these abbreviations, so the court will as well.

amount it was willing to pay for N.M.'s placement. But Clinity's policy was that it would not accept a recruitment fee of less than 20 percent.

On October 25, 2024, Amoskeag Health declined Clinity's final offer, which included a 20 percent recruitment fee. The same day, Mandeville, using the business name Propel Sourcing Solutions, made an offer to Amoskeag Health for N.M's placement; the offer included an 18 percent recruitment fee. Palermo learned of Mandeville's offer to Amoskeag Health and he fired Mandeville on October 28, 2024.

The court will discuss additional facts as they become relevant to the analysis.

This court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000, and it is between citizens of different states. Specifically, Mandeville is domiciled in Wisconsin, Palermo is domiciled in Montana, and Clinity's members, Palermo and non-party Camden Green, are domiciled in Montana and Nevada, respectively. Dkt. 88.

ANALYSIS

There are three summary judgment motions before the court: Mandeville moves for partial summary judgment on two of his claims; defendants move for partial summary judgment on most of Mandeville's claims; and Mandeville moves for summary judgment on all defendants' counterclaims. Rather than addressing the individual motions, the court will proceed claim by claim, starting with Mandeville's claims before turning to defendants' counterclaims.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court

3

construes all facts and draws all reasonable inferences in the non-moving party's favor. *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, AFL–CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016). Courts apply the same summary judgment standards when faced with cross-motions. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

## A.  Mandeville's claims

Mandeville asserts seven claims against defendants. Mandeville moves for summary judgment on his breach of contract claim against defendants, contending that they breached his employment contract by failing to pay him the commissions that he earned. Mandeville also moves for summary judgment on his claim under state wage law. Defendants move for summary judgment on Mandeville's state wage claim. Defendants also move for summary judgment on his claims for breach of the implied covenant of good faith, bad faith termination, defamation, unreasonable invasion of privacy, and tortious interference with contract.

### 1.  Breach of contract claim

A breach of contract claim has three elements: (1) an enforceable contract between the parties; (2) a breach of the contract; and (3) damages. *Pagoudis v. Keidl*, 2023 WI 27, ¶ 12, 406 Wis. 2d 542, 988 N.W.2d 606. Mandeville has adduced evidence showing that defendants breached the terms of his employment contract because they haven't paid him the commissions that he earned. Defendants' 2023 offer letter to Mandeville identifies itself as an "employment agreement." Dkt. 26, Ex. 1, at 1. The terms of the agreement require Clinity to pay Mandeville commission for a placing a candidate with one of Clinity's clients "if and when [Clinity's] client pays [Clinity]'s applicable invoice related to that placement." *Id.* at 2. It is undisputed that Mandeville was responsible for A.C., C.H., and K.R.'s placements and that

4

Clinity's clients paid the invoices for those placements. Dkt. 80, ¶¶ 24–27. But Clinity hasn't paid Mandeville commissions for those placements.

Defendants contend that they aren't liable for breach for three reasons: (1) Mandeville was an at-will employee; (2) Mandeville isn't entitled to the commissions under the terms of his employment contract; and (3) defendants have no duty to pay Mandeville the commissions.

### a. At-will employment relationship

Defendants contend that there is no employment contract because Mandeville was an at-will employee and "at-will employment relationships are specifically *not* contractual." Dkt. 35, at 14. But the "at-will" nature of an employment relationship doesn't mean, as defendants contend, that there is no contract whatsoever. Instead, a contract for employment at will *is* an employment contract. *Ashleson v. Lab. & Indus. Rev. Comm'n*, 216 Wis. 2d 23, 32, 573 N.W.2d 554, 560 (Ct. App. 1997). The "at-will" nature of an employment relationship simply means that both the employer and the employee are free to end the relationship at any time, for almost any reason. *See Mackenzie v. Miller Brewing Co.*, 2001 WI 23, ¶ 20, 241 Wis. 2d 700, 623 N.W.2d 739; *Bammert v. Don's Super Valu, Inc.*, 2002 WI 85, ¶¶ 8, 15, 245 Wis. 2d 347, 646 N.W.2d 365. Mandeville's offer letter reflects this arrangement: "The term of this agreement shall remain in place from year to year unless terminated in accordance with the provisions of this Agreement." Dkt. 26, Ex. 1, at 1.

### b. Entitlement to commissions

Defendants contend that they didn't breach Mandeville's employment contract because he isn't entitled to the commissions under its terms. *See* Dkt. 35, at 16–22. Defendants argue that Mandeville isn't entitled to the commissions for three reasons: (1) A.C., C.H., and K.R.'s

placements weren't finalized until *after* Mandeville was fired; (2) other Clinity employees had to help get the deals over the finish line; and (3) Mandeville was disloyal.

As for the first reason, Mandeville's employment contract doesn't require placements to be finalized before he is entitled to commission. Mandeville's contract entitles him to commission for bringing a candidate to Clinity if: (1) the "client retains that candidate as a direct and proximate/primary result of [his] services, as solely determined by [Clinity]"; and (2) the client pays Clinity the invoice related to the placement. Dkt. 26, Ex. 1, at 1–2. It is undisputed that Clinity's clients retained the candidates and that the clients paid Clinity's invoices for the placements. Dkt. 80, ¶ 27. The only remaining issue is whether Clinity determined that the clients retained the candidates as a "direct and proximate/primary" result of Mandeville's services. Defendants haven't submitted any evidence suggesting that Mandeville's services didn't satisfy this requirement; indeed, they concede that Mandeville was responsible for placing the candidates with Clinity's clients, *see* Dkt. 80, ¶¶ 24–25.

As for the second reason, Mandeville's employment contract doesn't require that he be *solely* responsible for a client's decision to retain a candidate. In fact, the opposite is true: Mandeville earned a commission even if he worked with a coworker on a deal. *See* Dkt. 26, Ex. 1, at 1.

As for the third reason, defendants contend that Mandeville isn't entitled to the commissions "because of his egregious, disloyal misconduct." Dkt. 35, at 21. Defendants accuse Mandeville of using proprietary information to steal a potential client from Clinity. *See id.* at 22. The court will discuss these allegations in more detail later in the opinion. For now, all that matters is that defendants argue that they can withhold Mandeville's commissions because of his alleged misconduct related to Amoskeag Health. *See id.* To support this argument,

6

defendants cite the agency law principle that an agent is "entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty." Restatement (Second) of Agency § 469 (1958). Defendants also cite the Wisconsin Supreme Court's decision in *Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 289 N.W.2d 280 (1980), in which the court held that whether the employee should be denied part of all his compensation for a willful and significant breach of the duty of loyalty turns on several factors, including the nature of the breach, the loss caused by the breach, and the value to the employer of the employee's services. *See Hartford*, 94 Wis. 2d at 586.

The problem with defendants' argument is that Mandeville earned commissions for his work placing A.C., C.H., and K.R. with Clinity's clients, not for his work with Amoskeag Health. Defendants haven't submitted evidence that Mandeville committed any misconduct in the course of placing A.C., C.H., and K.R. Nor have they submitted evidence that Mandeville committed misconduct during the time that he was placing them. So defendants have no right to withhold Mandeville's commissions for those placements based on later, unrelated misconduct.

### c.  Duty to pay

Defendants also contend that they have no duty to pay the commissions to Mandeville. They argue that the terms in Mandeville's offer letter were no longer in effect upon his termination, so they were not contractually obligated to pay him the commissions. *See* Dkt. 35, at 20. The problem with defendants' argument is that it necessarily assumes that Mandeville was not entitled to the commissions until *after* he was fired.

But an employee earns commission when he "procures an order from a ready, willing, and able purchaser, and this order is received by the company"—even if the order isn't delivered

to the purchaser or the payment for the order isn't received by the company until after the employee is terminated. *Zweck v. D. P. Way Corp.*, 70 Wis. 2d 426, 430–31, 234 N.W.2d 921, 924 (1975); *see Kreinz v. NDII Sec. Corp.*, 138 Wis. 2d 204, 211, 406 N.W.2d 164, 166–67 (Ct. App. 1987). Put differently, "final consummation of the sale is not required." *Leen v. Butter Co.*, 177 Wis. 2d 150, 153, 501 N.W.2d 847, 848 (Ct. App. 1993) (citation omitted).

Applying the principle from *Zweck* here, Mandeville earned the commissions when he placed A.C., C.H., and K.R. with Clinity's clients; that is when he procured "orders" from Clinity's clients, who were ready, willing, and able "purchasers." It is immaterial that A.C., C.H., and K.R. started working for Clinity's clients after Mandeville was terminated, because A.C., C.H., and K.R.'s start dates are analogous to delivery dates; they are when Clinity's clients received what they "ordered" from Clinity. It is also immaterial that Clinity's clients paid the invoices for the placements after defendants fired Mandeville; those dates are essentially when Clinity received payments for the "orders." Mandeville is entitled to his commissions.

The court will grant Mandeville summary judgment on his breach of contract claim and will award him the commissions he is owed, which total $84,613.50.[3]

### 2.  State wage law claim

Mandeville contends that defendants violated Wis. Stat. § 103.455 by withholding from him his earned commissions for his alleged self-dealing with Amoskeag Health. Dkt. 25,

---

[3] In light of the court's conclusion that defendants breached Mandeville's employment contract, the court will grant summary judgment to defendants on Mandeville's breach of the implied covenant of good faith and fair dealing claim. Mandeville's covenant of good faith claim must fail because Wisconsin law does not allow plaintiffs to recover damages for both claims. *Ladopoulos v. PDQ Food Stores, Inc.*, 2002 WI App 165, ¶ 24, 256 Wis. 2d 694, 647 N.W.2d 468; *see Eternix Ltd. v. CivilGEO, Inc.*, No. 23-cv-633-jdp, 2024 WL 2846769, at *6 (W.D. Wis. June 5, 2024).

at 14–17. Under Wis. Stat. § 103.455, employers generally may not deduct funds from their

employee's wages for work-related losses. Section 103.455 provides, in relevant part:

> No employer may make any deduction from the wages due or
> earned by any employee, who is not an independent contractor,
> for defective or faulty workmanship, lost or stolen property or
> damage to property, unless the employee authorizes the employer
> in writing to make that deduction or unless the employer and a
> representative designated by the employee determine that the
> defective or faulty workmanship, loss, theft or damage is due to
> the employee's negligence, carelessness, or willful and intentional
> conduct, or unless the employee is found guilty or held liable in a
> court of competent jurisdiction by reason of that negligence,
> carelessness, or willful and intentional conduct. If any deduction
> is made or credit taken by any employer that is not in accordance
> with this section, the employer shall be liable for twice the amount
> of the deduction or credit taken in a civil action brought by the
> employee.

Wis. Stat. § 103.455. Despite the term "faulty workmanship," the statute isn't limited to the

manufacturing context; instead, it broadly applies to "any employee" (but not independent

contractors), including those who receive compensation in the form of commissions. *Erdman v.*

*Jovoco, Inc.*, 181 Wis. 2d 736, 751–59, 512 N.W.2d 487, 492–95 (1994). If an employer

violates the statute by unlawfully deducting funds from an employee's earned wages, then the

employee is entitled to double damages. Wis. Stat. § 103.455.

Defendants contend that Wis. Stat. § 103.455 is inapplicable for two primary reasons.

First, defendants argue that Wis. Stat. § 103.455 doesn't apply because Mandeville's

claim is more properly considered as a wage *payment* claim rather than a wage *deduction* claim.

Dkt. 35, at 23. The court understands defendants to argue that Mandeville is actually

challenging their failure to pay his wages, not their decision to deduct his commissions.

*See* Dkt. 46, at 26. To support their argument, defendants cite Chapter 109 of the Wisconsin

Statutes, which addresses wage payments. But they don't explain why Chapter 109 provides

the proper vehicle for Mandeville's claims. Nor do they explain why Chapter 109 prevents Wis. Stat. § 103.455 from *also* applying to this case. Defendants have not pointed to *any* statute allowing them to withhold Mandeville's earned commissions.

Second, defendants argue that Wis. Stat. § 103.455 doesn't apply because this case involves different losses than those contemplated by the statute. Dkt. 46, at 26. Defendants are correct that the statute addresses only "defective or faulty workmanship, lost or stolen property or damage to property." Wis. Stat. § 103.455. But the term "lost or stolen property" is broad; it encompasses all types of work-related losses. *See Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 47, 384 N.W.2d 325, 329 (1986). The prototypical case involves cash shortages. For example, in *Donovan v. Schlesner*, a gas station operator deducted from an attendant's pay the discrepancies between "the property or items on hand [and] the amounts entered into the books representing sales." *Donovan*, 72 Wis. 2d 74, 76, 240 N.W.2d 135, 137 (1976). The loss in this case is analogous to *Donovan*. Defendants essentially accuse Mandeville of stealing a client and the related fee from them, which is akin to taking money out of the cash register.

Defendants contend that, even if Wis. Stat. § 103.455 applies to this case, they didn't violate the statute because they didn't deduct Mandeville's commissions from his pay. Instead, defendants argue that they "merely determined that Plaintiff was not entitled to the disputed commissions." Dkt. 35, at 23. In light of the court's conclusion that Mandeville *was* entitled to the commissions, defendants' contention is without merit.

Defendants also contend that they lawfully withheld Mandeville's commissions because Mandeville's "self-dealing" with Amoskeag Health caused them to lose out on the opportunity to retain Amoskeag Health as a client. Dkt. 46, at 26. Defendants' contention reflects

10

Wis. Stat. § 103.455's underlying principle: "The principle of law upon which [Wis. Stat. § 103.455] is based is that if an employee . . . causes the employer to suffer a loss, the employee is not entitled to full compensation." *Wandry*, 384 N.W.2d at 328. Defendants contend that Mandeville's self-dealing cost Clinity about $80,000. Dkt. 80, ¶ 28 (Mandeville's additional proposed findings of fact). And Palermo conceded at his deposition that defendants are withholding Mandeville's commissions (which total about $85,000) because of his self-dealing:

> Q: And with regard to the three candidates I mentioned by name, which one, two, or three of those candidates is Clinity disputing that commissions are owed for?
>
> A: All three.
>
> Q: Okay. And can you describe the basis that Clinity disputes that for the three?
>
> A: The -- the work was not completed; and Tom was terminated for self-dealing; and we left on bad terms.

Dkt. 38 (Palermo Dep. 33:24–34:7). In effect, defendants are deducting in full Mandeville's commissions because of the financial loss caused by his self-dealing.

But defendants' reason for withholding Mandeville's commissions does not comply with Wis. Stat. § 103.455. Under the statute, an employer *may* deduct from an employee's wages for work-related losses *if* at least one of the following conditions are met:

> (1) the employee authorizes the employer in writing to make that deduction;
>
> (2) the employer and a representative designated by the employee determine that the defective or faulty workmanship, loss, theft or damage is due to the employee's negligence, carelessness, or willful and intentional conduct; or
>
> (3) the employee is found guilty or held liable in a court of competent jurisdiction by reason of that negligence, carelessness, or willful and intentional conduct.

Wis. Stat. § 103.455. Mandeville's offer letter does not contain a provision authorizing defendants to deduct from his commissions for work-related losses, which rules out the first condition. Defendants have not adduced evidence showing that a representative designated by Mandeville determined that defendants' loss was due to his negligence, carelessness, or willful and intentional conduct. Nor have they adduced evidence showing that Mandeville has been held liable in court for his conduct. So they did not meet the second or third conditions either.

Because defendants failed to satisfy the conditions in Wis. Stat. § 103.455, they have unlawfully deducted Mandeville's commissions from his earned wages. As a result, they are "liable for twice the amount of the deduction or credit taken in a civil action brought by the employee." Wis. Stat. § 103.455. The court will grant Mandeville summary judgment on his state wage claim and award him an additional $84,613.50, for a total of $169,227.

### 3. Bad faith termination

Defendants had a legitimate reason for firing Mandeville: his self-dealing at the expense of his employer. Dkt. 46, at 24. But employers may not fire at-will employees to avoid paying them the benefits that they accrued before being let go. *Phillips v. U.S. Bank, N.A.*, 2010 WI App 35, ¶¶ 7–8, 324 Wis. 2d 151, 781 N.W.2d 540. Mandeville contends that defendants terminated him in bad faith to avoid paying him the commissions that he earned. *See* Dkt. 65, at 35–42. But Mandeville hasn't adduced evidence showing that defendants' reason for firing him was a pretext. Mandeville submits a paystub, which indicates that defendants paid him almost $3,000 in commissions after he was terminated. Dkt. 26, Ex. 2. The paystub supports a finding of pretext, the argument goes, because defendants are using Mandeville's termination as an excuse to withhold his commissions for placing A.C., C.H., and K.R. *See* Dkt. 65, at 38. But the question isn't whether defendants' reason for withholding Mandeville's commissions

is legitimate, at least not in the context of a bad faith termination claim. Rather, the question is whether defendants' reason for *terminating* Mandeville was false. Mandeville hasn't provided any evidence showing that's the case.

The court will grant summary judgment to defendants on Mandeville's bad faith termination claim.

### 4. Defamation

Mandeville contends that defendants defamed him in two ways: (1) Palermo posted about him on the social media website LinkedIn; and (2) Palermo talked about him with two other recruiting organizations, non-parties TAG MedStaffing and JL Pro.

A defamation claim has four elements: (1) a false statement; (2) that is communicated by speech, by conduct, or in writing to a person other than the person defamed; (3) that is unprivileged; and (4) that tends to harm one's reputation so as to lower the person in the estimation of the community or to deter third persons from associating or dealing with the person. *See Sidoff v. Merry*, 2023 WI App 49, ¶ 13, 409 Wis. 2d 186, 996 N.W.2d 88. Defendants assert two defenses to Mandeville's defamation claims: Palermo's statements about Mandeville were either true or they were just opinions. *Laughland v. Beckett*, 2015 WI App 70, ¶ 22, 365 Wis. 2d 148, 870 N.W.2d 466.

The court begins with Palermo's posting on LinkedIn. In his post, Palermo mentioned that Clinity had a "stronger smaller team" and that it had parted ways with people who "were not so great," including former employees who "competed against Clinity while on the job." Dkt. 48, Ex. 6, at 2. Here are those statements with some context:

> Clinity Talent is not going to hit our Headcount goal this year internally. Not that Headcount matters per say, because you'd rather have a stronger smaller team, than a weaker bigger team,

13

> but it's still a tad disappointing at the same time since ultimately you want to grow on all angles.
>
> . . .
>
> Although we've parted ways with some great people, some were not so great. Clinity has had their equipment stolen, we've had former employees have 2nd jobs, and we've also had former employees who competed against Clinity while on the job and acquired agreements on separate LLCs utilizing Clinity's sources. Yea. (and of course, all Legal steps have been taken).

*Id.* (cleaned up). Mandeville asserts that Palermo's LinkedIn post was about him, even though it didn't mention him by name.

None of the statements in Palermo's LinkedIn post can support a defamation claim. Palermo's statements that "you'd rather have a stronger smaller team, than a weaker bigger team" and "[a]lthough we've parted ways with some great people, some were not so great" are pure opinion statements, and pure opinion statements aren't actionable as defamation. *See Navratil v. City of Racine*, 101 F.4th 511, 525 (7th Cir. 2024) (citing Wisconsin law). Palermo's statement that "we've also had former employees who competed against Clinity while on the job and acquired agreements on separate LLCs utilizing Clinity's sources" is substantially true. Sure, Mandeville didn't form a separate LLC until November 6, 2024, which was after he was fired, Dkt. 69, Ex. 1, at 1, but whether Mandeville's LLC was registered at the time is immaterial. It is undisputed that Mandeville competed against Clinity by making an offer to Amoskeag Health for N.M.'s placement while he was employed at Clinity; and it is also undisputed that, after defendants fired him, Mandeville provided placement services for at least one of Clinity's former clients, securing agreements for his own benefit. Substantially true statements like these aren't actionable as defamation. *See Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417, 423 (1966).

Mandeville also contends that Palermo defamed him with statements he made to two recruiting organizations, non-parties TAG MedStaffing and JL Pro.

It is undisputed that Palermo had a "venting session" with non-party David Yoo of TAG MedStaffing and told Yoo that Mandeville had engaged in "self-dealing" at Clinity. Dkt. 80, ¶ 7 (Mandeville's additional proposed findings of fact). Palermo's statement has factual and opinion components. A so-called "mixed opinion" statement is actionable as defamation only if the statement "implies the assertion of undisclosed defamatory facts as the basis of the opinion." *Laughland*, 2015 WI App 70, ¶ 27 (citation omitted). Palermo's statement implies that Mandeville engaged in dealmaking on his own behalf. But that's undisputedly true— Mandeville sent the offer to Amoskeag Health on his own behalf, not for Clinity's benefit.

Mandeville asserts that Palermo made additional comments to Yoo. Mandeville submits a declaration from non-party Olivia Mahler, an employee at TAG MedStaffing, in which she avers that Yoo told her that Palermo told him the following:

> Tom did some really shady things at Clinity.
>
> Tom was trying to steal clients from Clinity.
>
> Tom started his own agency while still employed with Clinity.
>
> I'm going to have to pursue legal action against Tom because of the way the termination happened.

Dkt. 68, ¶ 12 (cleaned up). Defendants move to strike Mahler's declaration, contending that it is inadmissible hearsay, Dkt. 78, at 5–6, and the court will grant their motion. "Where a plaintiff attempts to introduce the testimony of an individual who did not personally witness the alleged defamatory statement but was later told by another that the statement was made, such testimony is rejected as hearsay." *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007). The court will not consider Mahler's declaration.

As for Palermo's statements to JL Pro, Mandeville submits two email messages from November 2024. In the first email message, Palermo refers to a phone call during which he "told [JL Pro] about Tom." Dkt. 69, Ex. 5, at 1. This statement isn't defamatory, and it isn't reasonable to infer from this statement that Palermo made defamatory statements about Mandeville during the phone call with JL Pro. In the second email message, Palmero describes Mandeville as the person "who betrayed us" *Id.* at 2. This statement is pure opinion and thus not actionable as defamation. *Navratil*, 101 F.4th at 525.

The court will grant summary judgment to defendants on Mandeville's defamation claim.

### 5. Unreasonable invasion of privacy

Wisconsin law provides four causes of action for an individual to vindicate invasions of his right to privacy. Wis. Stat. § 995.50. The type of invasion of privacy claim at issue here relates to giving publicity to private facts about an individual. *Id.* § 995.50(2)(am)3. This type of claim has four elements:

> (1) a public disclosure of facts regarding the plaintiff;
>
> (2) the facts disclosed are private facts;
>
> (3) the private matter made public is one which would be highly offensive to a reasonable person of ordinary sensibilities; and
>
> (4) the defendant acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter, or with actual knowledge that none existed.

*Pachowitz v. Ledoux*, 2003 WI App 120, ¶ 18, 265 Wis. 2d 631, 666 N.W.2d 88.

Mandeville's invasion of privacy claim involves Palermo's LinkedIn post and his statements to non-party David Yoo, which the court previously discussed in the defamation context. As relevant here, Palermo's LinkedIn post states that Clinity "parted ways with

16

. . . some [people who] were not so great," including "former employees who competed against Clinity while on the job and acquired agreements on separate LLCs utilizing Clinity's sources." Dkt. 48, Ex. 6, at 2. Palermo told Yoo that Mandeville had engaged in "self-dealing" at Clinity. Dkt. 80, ¶ 7 (Mandeville's additional proposed findings of fact).

Defendants contend that Mandeville's invasion of privacy claim fails because Palermo's statements did not reveal private facts about Mandeville. *See* Dkt. 46, at 30–31; Dkt. 78, at 17–18. In response, Mandeville points to the Wisconsin Supreme Court's decision in *Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d 913, 440 N.W.2d 548 (1989). In *Zinda*, the plaintiff sued his former employer after the employer named the plaintiff in its company newsletter and stated that the plaintiff had been terminated for falsifying employment forms. *See Zinda*, 440 N.W.2d at 550. The court held that the plaintiff established a prima facie claim for invasion of privacy. *Id.* at 555. Mandeville argues that this case is materially the same as *Zinda* because Palermo's statements revealed why defendants fired him. *See* Dkt. 65, at 56–57.

This case differs from *Zinda* in material respects. Unlike the newsletter in *Zinda*, Palermo's LinkedIn post did not explicitly name Mandeville, state that he had been terminated, or reveal the reason why defendants terminated him. True, some people might have been able to ascertain Mandeville's identity—Mandeville submits a declaration in which he avers that he was one of two employees fired for misconduct in recent months, *see* Dkt. 69, ¶¶ 20–21. Even so, the only people able to figure out the reason why Mandeville was fired would already know that defendants terminated him and that he engaged in self-dealing, which means that Palermo wouldn't have disclosed private facts about Mandeville to them. As for Palermo's statement to Yoo, Palermo didn't tell Yoo why defendants fired Mandeville, making *Zinda* inapplicable. Dkt. 38 (Palermo Dep. 80:9–15).

17

In any event, the facts about Mandeville in Palermo's statements weren't "private facts." The term "private facts" refers to intimate details about an individual's private life that are not publicly known. *See* Wis. Stat. § 995.50(2)(am)3. Stated another way, "private facts" are those which a person "do[es] not expose to the public eye, but keep[s] entirely to [himself] or at most reveal[s] only to family or close personal friends." *Zinda*, 440 N.W.2d at 555. For example, in *Pachowitz*, the defendant disclosed a private fact about the plaintiff by telling the plaintiff's close friend that the defendant had transported the plaintiff to the emergency room for a possible overdose. *See Pachowitz*, 2003 WI App 120, ¶¶ 5–6, 27. In contrast, if personal information is already open to the public eye, then it is not a "private fact." *See* Restatement (Second) of Torts § 652D cmt. b (A.L.I. 1977). For example, facts about a "business or activity in which the plaintiff is engaged in dealing with the public" are not private facts. *Id.* Defendants terminated Mandeville because he made a competitive offer to Amoskeag Health for N.M.'s placement while he was vice president of Clinity. Mandeville might have wanted his offer to Amoskeag Health and his termination to remain secrets, but that doesn't transform facts about his public business dealings into facts about his private life.

The court will grant summary judgment to defendants on Mandeville's invasion of privacy claim.

### 6. Tortious interference with contract

Mandeville contends that defendants tortiously interfered with his prospective contractual relationship with TAG MedStaffing because Palermo told Yoo that Mandeville had engaged in self-dealing.

A tortious interference with a contract claim has five elements:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party;

18

(2) the defendant interfered with that relationship;

(3) the interference by the defendant was intentional;

(4) there was a causal connection between the interference and damages; and

(5) the defendant was not justified or privileged to interfere.

*Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531. The first element is dispositive. When, as here, a plaintiff rests his claim on a prospective contractual relationship, the plaintiff must adduce evidence showing that the prospective contractual relationship would have accrued absent the defendant's wrongful conduct. *State v. Johnson*, 2005 WI App 201, ¶ 20, 287 Wis. 2d 381, 704 N.W.2d 625. Mandeville has not adduced evidence of a contractual relationship that was certain enough to meet this standard. In his declaration, Mandeville avers that he told non-party Olivia Mahler that he was interested in an open recruiter position with TAG MedStaffing, and he avers that Mahler offered to speak with non-party David Yoo and recommend him for the position. Dkt. 71, ¶ 26. But he does not submit evidence showing that his discussions with TAG MedStaffing went beyond these preliminary discussions.

The court will grant summary judgment to defendants on Mandeville's tortious interference with contract claim.

## B. Defendants' counterclaims

Defendants assert breach of contract, tortious interference with contract, and breach of fiduciary duty counterclaims against Mandeville based on his offer to Amoskeag Health for N.M.'s placement. Defendants affirmatively move for summary judgment on their breach of fiduciary duty counterclaim. Mandeville moves for summary judgment on all counterclaims. The court will address defendants' counterclaims together because they fail for the same reason:

19

defendants have not adduced evidence of damages, which is a required element for each counterclaim. *Pagoudis*, 2023 WI 27, ¶ 12 (breach of contract); *Briesemeister*, 2006 WI App 140, ¶ 48 (tortious interference with contract) *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 752 N.W.2d 800 (breach of fiduciary duty).

Mandeville contends that defendants can't prove that they suffered damages arising from his offer to Amoskeag Health for N.M.'s placement. He proposes the following facts:

> Defendant Clinity's written discovery responses provided no evidence or information to substantiate any financial loss or damages suffered by Defendants or caused by Plaintiff.
>
> Likewise the entirety of Defendant Clinity's responsive document production produced no evidence to substantiate any financial loss or damages suffered by Defendants.

Dkt. 80, ¶¶ 26–27 (cleaned up).

Defendants attempt to dispute these proposed facts, citing their opposition to Mandeville's motion for summary judgment on their counterclaims, in which they point to the following evidence to show that they suffered damages:

> Transactions totaling almost $64,000, which are the commissions that Mandeville earned at his consulting company from March to July 2025. Dkt. 63, Ex. 1;
>
> Text messages that two of Mandeville's former coworkers exchanged on October 23, 2024, that discuss Mandeville's offer to Amoskeag Health. Dkt. 48, Ex. 3;
>
> Messages that Mandeville sent on October 29 and October 31, 2024, to non-party James Romboldi, who was apparently associated with one of Clinity's then-clients, in which Mandeville discussed sending a contract from his consulting company to the client. Dkt. 63, Ex. 2;
>
> Testimony from Mandeville's deposition, in which he admits that, after he was fired from Clinity, he worked with one of Clinity's former clients, St. Joseph's Hospital, and was paid about $50,000. Dkt. 39 (Mandeville Dep. 108:6–23).

20

This evidence suggests that Mandeville earned commissions from Clinity's former clients after defendants fired him. But that's immaterial—what matters is whether Mandeville's offer to Amoskeag Health for N.M.'s placement caused defendants to suffer damages, and there's no evidence suggesting that's the case. Clinity failed to land the deal with Amoskeag Health because Clinity's recruitment fee was too high.

Defendants resist this conclusion for two reasons, neither of which are persuasive.

First, in their reply in support of their motion for partial summary judgment, defendants cite email messages that they exchanged with Amoskeag Health in the days following Mandeville's termination. Dkt. 78, at 7. Defendants argue that the email messages show that Amoskeag Health "remained interested in Clinity's candidate and merely sought to pressure or otherwise negotiate Defendants into a lower percentage," Dkt. 78, at 7. They also argue that "Amoskeag Health declined once it learned that Plaintiff misrepresented [N.M.'s] underlying qualifications and experience." Dkt. 62, at 11. Defendants' arguments are not supported by the evidence. According to the email messages, an Amoskeag Health representative agreed to speak with defendants about "next steps" in securing N.M.'s placement and stated that he "looked forward to chatting with [defendants]." Dkt. 48, Ex. 4, at 4. It is not reasonable to infer from this exchange that Mandeville's offer to Amoskeag Health caused Clinity to lose Amoskeag Health as a potential client because negotiations resumed between Clinity and Amoskeag Health *despite* Mandeville's offer.

Second, in their opposition to Mandeville's motion for summary judgment on their counterclaims, defendants argue that it is premature to consider whether they have evidence that they suffered damages because discovery is ongoing. *See id.* at 16–18. But parties can't avoid summary judgment by pointing to the fact that discovery remains open. *Jimenez v. Kiefer*,

100 F.4th 931, 939 (7th Cir. 2024). If a party needs more time to oppose a motion for summary judgment, Rule 56(d) of the Federal Rules of Civil Procedure requires the party to submit an affidavit or declaration explaining why. Defendants haven't done so. Instead, they simply assert that they still have 70 days to "complete their investigation." Dkt. 62, at 17. But Rule 56(d) "requires more than a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019).

The court will grant summary judgment to Mandeville on defendants' breach of contract, tortious interference with contract, and breach of fiduciary duty counterclaims.

## CONCLUSION

The court will grant summary judgment in Mandeville's favor on his breach of contract claim and state-law wage claim. As a result, the court will award damages to Mandeville in the amount of $169,227. The court will also grant summary judgment to Mandeville on defendants' breach of contract, tortious interference with contract, and breach of fiduciary duty counterclaims.

The court will grant summary judgment to defendants on Mandeville's breach of the implied covenant of good faith and fair dealing, bad faith termination, defamation, invasion of privacy, and tortious interference with contract claims.

Because all claims and counterclaims have been resolved on the merits and damages have been determined, the court will enter judgment and close the case.

## ORDER

IT IS ORDERED that:

1. Plaintiff Thomas Mandeville's motion for partial summary judgment on his breach of contract claim and his state wage law claim, Dkt. 24, is GRANTED, and Mandeville is awarded damages in the amount of $169,227.

2. Defendants Clinity Talent, LLC and Robert Palermo's motion for partial summary judgment, Dkt. 45, is GRANTED in part. The motion is granted on Mandeville's breach of the implied covenant of good faith and fair dealing, bad faith termination, defamation, invasion of privacy, and tortious interference with contract claims. The motion is otherwise denied.

3. Defendants motion to strike, Dkt. 78, is GRANTED in part. The motion is granted on the declaration of non-party Olivia Mahler. The motion is otherwise denied as moot.

4. Mandeville's motion for leave to file a sur-reply brief, Dkt. 81, is GRANTED.

5. Mandeville's motion for summary judgment to dismiss defendants' counterclaims, Dkt. 52, is GRANTED.

6. The clerk of court is directed to enter judgment accordingly and close the case.

Entered June 1, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

23